PUBLIC UTILITIES COMMISSION *vs.* RHODE ISLAND CO.

(Appeal of the town of Warwick.)
(Appeal of the city of Cranston.)
(Appeal of the town of Johnston.)
(Appeal of the town of North Providence.)
(Appeal of the city of Cranston).
(Appeal of the city of Cranston.)
(Appeal of the town of Warwick.)
(Appeal of the city of Cranston.)
(Appeal of the town of Burrillville.)
(Appeal of the town of West Warwick.)
(Appeal of the town of Cumberland.)
(Appeal of the town of East Greenwich.)
(Appeal of the town of Johnston.)
(Appeal of the city of Pawtucket.)
(Appeal of the town of North Providence.)

JUNE 30, 1920.

PRESENT:   Sweetland, C. J., Vincent, Stearns, Rathbun, and Sweeney, JJ.

*(1)   Public Utilities.   Regulation of Rates.*
Pub. Laws, 1624, approved April 18, 1918, gives clear and ample authority to the Public Utilities Commission to regulate the system of fares and transfers of the Rhode Island Company a common carrier operating a street railway system.

*(2)    Public Utilities.    Regulation of Rates.    Receivers.*

Where increased revenue was required to continue the operation of a street railway system, the receivers of the company, having the duty of managing the property and conserving it against waste and loss, properly presented their petition to the Public Utilities Commission for an increase of fares, without requesting the authority so to do from the court which appointed them.

*(3)    Public Utilities.    Regulation of Rates.*

Regulation of rates of fares of a public utility operating a street railway system, affects the general public and not merely the inhabitants of any particular locality, and the court cannot find that inequalities claimed by various municipalities in the rates warrant the charge of unjust discrimination.

*(4)    Public Utilities.    Regulation of Rates.    Contracts.    Municipal Corporations.*

Where a contract between a town and a street railway company had expired and no new contract was made, the company having previously accepted the provisions of Pub. Laws, cap. 580 (1898) the payments thereafter made to the town were made under the provisions of cap. 580, which was an act binding between the State and the assenting street railway company, to the provisions of which the assent of the various municipalities was neither provided for nor required.

*(5)    Regulation of Rates.    Public Utilities Commission,*

The paramount authority of the State to regulate rates of public utilities through the agency of a commission is well established.

APPEALS from order of the Public Utility Commission. Appeals denied and dismissed.

STEARNS, J.    These are appeals taken at different times under the provisions of Chapter 795, Section 34, Public Laws, 1912, by various municipalities, from different orders made by the Public Utilities Commission.

Appeals numbered 325 to 333, inclusive, which were taken from the order of the Commission entered September 23, 1919, were the only ones which were pressed before this court.    Arguments were made and briefs were presented by the representatives of Cranston and Warwick in behalf of those municipalities, and the cases of the other appellants were submitted without argument or briefs.

The Rhode Island Company is the operating company of the greater part of the street railway system of this state.

Its control of the different street railways was secured by long term leases or by purchase.   In 1907 the Rhode Island Company was acquired for the New York, New Haven & Hartford R. R. Co., and in 1914, in proceedings brought under the Sherman Antitrust Law, Federal trustees were appointed by the courts of the United States to control and manage the properties.   In 1917 a special commission was appointed by the legislature (Chap. 1516, Pub. Laws 1917) to investigate the finances, management, property and mode of operation of the Rhode Island Company, for the purpose of determining whether proper service was furnished by the company and whether the company was receiving a fair and equitable return upon the property.

The Commission was authorized and directed to determine upon such modification of rates of fare, transfers or systems of fares and transfers as they should find to be just and equitable, to certify its determination thereof to the Public Utilities Commission and said Commission was directed to order the Rhode Island Company to make such modifications as were determined upon by the special commission. It was further provided (Sec. 3) as follows: "Such modifications shall be subject to change from time to time by the Public Utilities Commission whenever in its opinion the public interest shall so demand and the affairs of the Rhode Island Company shall warrant."

March 7, 1918, the special commission made its report to the legislature.   The Commission reported that the Rhode Island Company did not receive a fair and equitable return upon its property; that for several years the property of the company had been operated at a heavy loss and that a modification of the system of fares and transfers then in effect was necessary to provide in part for a fair return upon the property.   The Commission recommended that the primary regulation of the utility be by the Public Utilities Commission, that municipal franchises be abolished, that the company be relieved of certain obligations in regard to the paving of streets, that changes be made in the routing

of the cars and that changes in equipment recommended by the Commission's engineers be made as soon as practicable.

By an act, approved March 15, 1918 (Chap. 1614, Pub. Laws, 1918), another special legislative committee was created to investigate the affairs of the Rhode Island Company and to consider the report of the special commission referred to above, with direction to report its finding and recommendations to the General Assembly on or before March 26, 1918. By an act, approved March 19, 1918, (Chap. 1615), the authority given to the Commission by Chapter 1516 to put into effect the determination of the special commission was revoked and the Commission was directed not to order any change to be made in the fares charged by the Rhode Island Company until further ordered by the General Assembly. April 2, 1918, the special legislative committee presented a report and an act authorizing the Public Utilities Commission to approve an increase of fares charged by the Rhode Island Company from five cents to six cents; by Chapter 1624, approved April 18, 1918, the determination of the special commission appointed under the provisions of Chapter 1516 was ratified and confirmed and the Public Utilities Commission was directed to order the Rhode Island Company to make such modifications in its system of fares and transfers as recommended by said Commission. A right of appeal from such order was given and it was further provided that the modification thus made "shall be subject to change from time to time by the Public Utilities Commission whenever in its opinion the public interest shall so demand and the affairs of the Rhode Island Company shall warrant." The new schedules were to continue in force during the war with Germany and one year after, unless sooner abrogated or changed by the Public Utilities Commission.

The effect of this act (Chap. 1624) and action taken thereunder, was to substitute the zone system of fares for a general six cent fare as provided for in the act reported by the special legislative committee. Under the new system

there was established about the Providence traffic center a central five cent fare and transfer zone with an air line radius of two and one-half miles.  About the centers of Pawtucket, Woonsocket and Riverpoint there were established zones with air line radii of two miles in length.  Outside of these various traffic centers were suburban zones in which a fare of two cents was charged. . New tariffs were filed by the company with the Public Utilities Commission on August 15, 1918, which provided for increased fares, and on the 16th day of September hearings were had before the Commission and on the 19th day of October, 1918, the Commission entered an order requiring the company to file supplements in modification of its tariffs already filed. The general result of the order was to cut down the radius of the central zone about the traffic center of Providence to a radius of two miles, to make the fare in all zones suburban as well as central zones, five cents, to fix a charge of one cent for each transfer issued.  In its order the Commission directed that the tariffs and supplements made effective on October 23 should remain effective until the 1st day of March, 1919.  Before the period during which this last order of the Commission was to run had expired, a temporary receiver of the Rhode Island Company was appointed by the Superior Court on the 30th day of January, 1919.  On the 5th day of March, 1919, Frank H. Swan, Theodore Francis Green and Zenas W. Bliss were appointed receivers of the Rhode Island Company.  On February 26, 1919, the Commission entered an order to the effect that the tariffs and supplements made effective under the order of the Commission dated October 19, 1918, should be and remain effective until the 1st day of May, 1919.  The Commission also provided by its order that the company should present for consideration on or before April 1 a tentative form of tariff covering certain proposed changes on its suburban lines.  On the 30th day of April, 1919, an order was entered by the Public Utilities Commission which continued in force the existing tariffs with certain modifica-

tions. The Commission also provided, in reference to the tariffs and supplements thereby made effective, that the Rhode Island Company, after a period of three months, might present to the Commission such requests or suggestions for the modification of said tariffs as might seem to be necessary. From July 19 to August 6, 1919, there was a strike of the employees of the company to obtain increased wages. Later an agreement was reached whereby substantial increases were made in the pay of the employees of the company. On August 8, 1919, the receivers filed their petition with the Public Utilities Commission in which they set out the financial condition of the property in their hands and prayed that an order might be entered modifying the tariffs then in existence. In this petition three plans for increasing the revenue of the company were set forth.

At the hearing on the petition another plan was submitted by the town of Warwick.

On the 23d of August, 1919, the Commission entered its order whereby the Rhode Island Company was directed to file tariffs in modification of the existing tariffs in accordance with Plan "B," so-called. The effect of the order was to maintain the zone limits existing at the time, to increase the fare from five cents to six cents in each zone and the charge for transfers from one cent to two cents. Said tariffs were to remain effective during the receivership of the company and until otherwise ordered by the Commission. The Rhode Island Company was required to file a detailed financial statement each month with the Commission, showing the monthly results of the new tariffs. The Commission by the terms of the order expressly retained jurisdiction to make such revision of the new rates as might later be found to be advisable because of changes in operating expenses or operating revenue, or for other reasons at any time. Various appeals were taken from the different orders entered prior to September 23, 1919, and in each case this court, on motion made, held that the appeal should not operate as a stay of the order. (Chap. 795, Sec. 35,

Pub. Laws, 1912) At the present time the receivers are operating the railroad and are collecting the passenger revenue under the terms of the order of the Public Utilities Commission entered on September 23, 1919, from which order the appeals now are pressed.

We have stated at some length above the recent history of the street railway company and the action of the legislature and the Public Utilities Commission in reference to the conduct of the business of the company for one reason, among others, that we consider the mere statement of the facts and a consideration of the enactments of the legislature above referred to disposes of most, if not all, of the objections raised by the appellants. No question is raised in regard to the power of the legislature to give authority to the Commission to regulate the public utility in question, but the argument is made that it has not done so. We think there is no merit in this contention and without detailed discussion of the matter we think the authority of the Commission is clear and ample in regard to the subject matters under discussion.

One reason of appeal is that the increase of rates ordered by the Commission was not necessary. If any doubt could fairly be entertained on this point, and it is difficult to see how it could be, such doubt is removed by a consideration of the history of the street railway company since the passage of the order of September, 1919, down to the present time. At the hearing on the petition the appellants presented no testimony to show that the company was not in need of increased revenue. All of the experts who gave their testimony agreed that there was need of more revenue. The appellants sought by dissection of the testimony of the experts to show that too large an allowance had been made in their estimates as a reserve for depreciation and the argument was made that provision was being made by the new rates for new construction under the head of replacements, which properly should be charged to capital and that the increased revenue would enable the company to pay

dividends, etc.  These objections are answered in a conclusive manner by the results of the new rates up to the present time.  It is a matter of public record and public knowledge that the company is still in the hands of receivers and that it has been and is today being operated at a loss. It is in testimony that the receivers were unable to borrow on the security of the company sufficient money to ensure the continued operation of the railroad.  It was and is today a matter a vital interest to the State and its inhabitants that there should be no stoppage of transportation by the street railway company.  Transportation is in the (2) nature of a commodity.  It is provided not by public funds but by private capital.  It cannot for any length of time be furnished to a community for less than cost which includes not only the expenditure for operation, etc., but also a fair return on the capital actually required to furnish the transportation.  Increased revenue was required in order to continue the operation of the cars.  Such being the case, the objection made that the receivers had no authority to petition the Commission for an increase of fares without authority being given to them by the court, which appointed them, is of no weight.  It was the duty of the receivers to manage the property and to conserve it against waste and loss and their action in presenting their petition to the Commission was proper.  As the Commission had authority to make the investigation of its own motion (Sec. 26, Chap. 795), the method by which the investigation was started does not affect the validity of the Commission's findings.  Objection is also made that the increase of rates is unjustly discriminatory in its effect upon various municipalities.  The regulation of rates of fares affects the general (3) public and not merely the inhabitants of any particular locality.  It is conceded by the Commission that in certain places there may be some inequality in the effect of the rates.  But the present scheme is experimental and, like all general plans designed to provide for a variety of different conditions, could hardly be expected to fit every situation.

Both the legislature and the Commission have evolved various plans for the solution of the existing difficulties and as yet none has been entirely successful. From the testimony it is apparent that the Commission have made earnest effort to work out a plan which would do justice to the different communities and to the owners of the property. Whatever inequalities there may be in the present rates do not warrant the charge of unjust discrimination, but in part, at least, they arise from the location and layout of the street railway tracks in certain municipalities.

The city of Cranston claims that the order for the increase of fares violates the rights of the city secured by contract with the railroad company and that if said Chapter 1624 and any other of the acts referred to are held to give the Commission the authority claimed that such acts are unconstitutional. The discussion of this latter objection is unnecessary as in our opinion the question raised is answered by the construction of the statutes and there is no violation of contract.

In 1893 the town of Cranston entered into a contract with the Union Railroad Company, the predecessor of the Rhode Island Company, under authority of Chapter 975, Public Laws, 1891, and granted to the company an exclusive franchise for twenty years; the company agreed with said town that the fares for a continuous passage between any two points in said town should not exceed ten cents.

In 1898, by Chapter 580, Public Laws (now Chapter 216, General Laws), an act entitled, "Of the Taxation of Street Railways" was passed by the legislature. This act provided that street railway companies accepting the provisions of the act should enjoy such rights, privileges or franchises as it had at the time of acceptance subject, however, to the provision (Sec. 2) that every company accepting the provisions of the chapter "shall so long as it continues to enjoy the rights, privileges and franchises aforesaid, continue to pay to the several cities and towns, notwithstanding the expiration of any existing contracts or agreements, such

sums as are now or may be required thereunder until new contracts or agreements shall be made, and such sums not less however, than those paid at the expiration of such existing contracts or agreements, as may thereafter be agreed upon from time to time   .   .   ."

By Section 10 it was provided that the act should not take effect and the payments provided therein be made until written assent to the act was delivered by the company to the State of Rhode Island, when the secretary of state was authorized and directed to accept the same in the name and behalf of the state, and under the seal of the state to execute such acceptance in duplicate; to deliver one duplicate to the assenting company and the other to the general treasurer of the state and it further provided that *thereupon* the act (4) "shall be binding and in full force *between the state and such assenting company* and shall not be altered or amended without the consent of both parties, and all acts and parts of acts, ordinances, votes and assents inconsistent herewith are hereby annulled and repealed."

By its express terms the contract between the town and the railroad company was limited to twenty years. It is not necessary to consider the rights of the town and the company during this period. At the end of the twenty years, in 1913, the contract by its terms came to an end and no new contract was made. Since 1913 the payments to the town have been made under the provisions of said Chapter 580. By said chapter the assent of the various municipalities to the provisions thereof was neither provided for nor required. When the railroad company assented thereto, by the express terms of the act it was provided that the act should be binding between the State and the assenting company. The municipalities were still entitled to payments from the company according to the terms of the act. But these payments at the time in question (after the expiration of the contract) were made in accordance with an act of the legislature and not in fulfillment of the terms of an existing contract. The rights of

the company and the extent thereof are not in issue.    The validity of said act is not questioned by the company but, on the contrary, is affirmed.

That the State did not surrender unrestrictedly to the municipalities its governmental power of regulating rates is evidenced by the enactment in 1902, of the "Free transfer act" (Pub. Laws, Chap. 965, 1008).

In *Milwaukee Electric Railway & Light Co.* v. *Railroad Commission of Wisconsin*, 238 U. S. 174 (1915), the question was in regard to the power of the public service commission to fix rates to be charged by a street railway company and to change rates theretofore made by agreement between the city and the railway company.    The law was thus summarized by the court, at p. 180:    "The fixing of rates which may be charged by public service corporations, of the character here involved, is a legislative function of the State, and while the right to make contracts which shall prevent the State during a given period from exercising this important power has been recognized and approved by judicial decisions, it has been uniformly held in this court that the renunciation of a sovereign right of this character must be evidenced by terms so clear and unequivocal as to permit of no doubt as to their proper construction.    This proposition has been so frequently declared by decisions of this court as to render unnecessary any reference to the many cases in which the doctrine has been affirmed."

The paramount authority of the State to regulate rates of public utilities through the agency of a commission is well established.    *Phillipsburg* v. *Public Utility Bd.*, 85 N. J. Law, 141 (1913); *City of Pawhuska* v. *Pawhuska Oil & Gas Co.*, 250 U. S. 394 (1919); *Board of Survey of Arlington* v. *Bay State Ry. Co.* 224 Mass. 463 (1916); *Benwood* v. *Public Service Commission*, 75 W. Va. 127 (1914); *Puget Sound Traction, Light & Power Co.* v. *Reynolds et al.*, 244 U. S. 574 (1917); *Portland* v. *Public Service Commission*, 89 Oregon, 325 (1918); *City of Worcester* v. *Worcester Consolidated St. Ry. Co.*, 196 U. S. 539 (1905).

The orders of the Public Utilities Commission appealed from are sustained and affirmed.   The appeals therefrom are denied and dismissed.

*Herbert A. Rice, Attorney General of State of Rhode Island,* for Public Utilities Commission.

*Clifford Whipple, G. Frederick Frost, Earl A. Sweeney,* all of Providence, for Rhode Island Co.

*Harold R. Curtis, Town Solicitor,* for town of Warwick.

*Frank H. Wildes, City Solicitor,* for city of Cranston.

*James E. Dooley, Town Solicitor,* for town of Johnston.

*Cushing, Carroll & McCartin, Arthur Cushing,* all of Providence, for town of North Providence.

*John J. Lace, Jr., Town Solicitor,* for town of Burrillville.

*Patrick E. Dillon, Town Solicitor,* for town of Cumberland.

*John F. Murphy, Town Solicitor,* for town of West Warwick.

*Alfred G. Chaffee,* of Providence, for town of East Greenwich.

*James G. Connolly, City Solicitor,* for city of Pawtucket.